[Criminal No. 638.   Filed April 11, 1927.]

[255 Pac. 165.]

# WALTER BRIMHALL, Appellant, v. STATE, Respondent.

Mr. Leo Alldredge, Mr. Harry I. Howard, Mr. Thos. E. Flannigan and Mr. E. J. Flanigan, for Appellant.

Mr. John W. Murphy, Attorney General, and Mr. Earl Anderson and Mr. Frank J. Duffy, Assistant Attorneys General, for the State.

ROSS, C. J.—Defendant was convicted of aggravated assault. He appeals.

The information charged, in substance, that the defendant, on May 25, 1925, in Maricopa county, Arizona, while intoxicated, in a grossly and criminally negligent manner, with reckless disregard of his own safety and wilful indifference to the consequences liable to follow and with reckless disregard of the lives and safety of others, drove his automobile at night-time, without headlights, and on the wrong side of the public road, at a speed in excess of that allowed by law, and while thus driving he did wilfully, unlawfully, negligently and feloniously commit an assault upon the body and person of one Lena McKinney by running and driving with great force and violence his automobile into and against an automobile in which the said Lena McKinney was a passenger, inflicting upon her person serious bodily injuries.

The defendant filed a demurrer to this information on the ground that it failed to state the acts constituting the offense charged in ordinary and concise language and in such manner as to enable a person of common understanding to know what was intended, and on the further ground that the facts stated did not constitute a public offense. The particular point made is that an assault requires a specific intent, and the information, to be good, must allege such intent.

The statutory definition of an assault is that it "is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Section 207, Penal Code 1913. The word "assault" carries the idea of illegality and imports all the elements contained in the statutory definition. An information is sufficient which merely alleges an assault. 5 C. J. 764, and cases cited in note 83. "The minute details of the manner of the assault are matters of evidence and not of pleading." *Territory* v. *Gonzales,* 14 N. M. 31, 89 Pac. 250.

Bishop on Statutory Crimes, section 514, says that it is a sufficient allegation under the common law to state that the defendant "did make an assault" on a person named. *McNamara* v. *People,* 24 Colo. 61, 48 Pac. 541.

Our definition of assault is practically that of the common law. *People* v. *Wells,* 145 Cal. 138, 78 Pac. 470; *People* v. *Lee Kong,* 95 Cal. 666, 29 Am. St. Rep. 165, 17 L. R. A. 626, 30 Pac. 800.

In *People* v. *Savercool,* 81 Cal. 650, 22 Pac. 856, it is said:

"The ultimate or issuable facts which the statute declares to constitute the offense are to be pleaded substantially in the language of the law, while probative facts, such as the intent with which an assault is made, and the 'present ability' to do it, must be proved, but need not be alleged in the information or indictment."

Section 215 of the Penal Code of 1913 enumerates seven different circumstances under which an assault may become aggravated. The particular acts alleged in this information bring this case within subdivision 5 thereof, which reads: "When a serious bodily injury is inflicted upon the person assaulted." An aggravated assault therefore differs from simple assault only in that there is added thereto another object which is criminal—the infliction of serious bodily injury.

It is also contended that the information is bad in that it shows on its face defendant did not intentionally assault the prosecuting witness, but, if anything, negligently ran his car into the car occupied by her, and that the negligent infliction of bodily injury on another is not an aggravated assault or battery. Whether one is criminally liable for personal injury inflicted upon another depends upon the character or kind of negligence. If it is a failure to exercise ordinary care the injured person

may have his action for damages, but the state has never thought to punish him as for a crime. Where, however, the injury is the result of reckless, wanton and wilful conduct, showing an utter disregard for the safety of others, the law imputes to the wrong-doer a wilful and malicious intention even though he may not in fact have entertained such intention. There are numerous cases where conviction for manslaughter has been sustained when death was caused by the reckless driving of an automobile, the courts holding in all such cases that the intent to kill, or malice, was not necessary. Convictions of this kind have occurred in practically every state in the Union, and there has been a uniformity of decision upholding conviction. *State* v. *Trott,* 190 N. C. 674, 42 A. L. R. 1114, and annotation at page 1120, 130 S. E. 627. Earlier cases may be found collected in 16 A. L. R. 914, 21 A. L. R. 1504, 27 A. L. R. 1182, 30 A. L. R. 66, and 41 A. L. R. 725.

The question as to whether the driver may be prosecuted and convicted for aggravated assault or battery when the injury stops short of death but inflicts serious bodily injury has not come before the courts so frequently. Where such prosecutions have been had it seems that the courts have generally, if not uniformly, sustained them. In *People* v. *Anderson,* 310 Ill. 389, 141 N. E. 727, the prosecution was for an assault with intent to commit bodily injury, and the court there said:

"We have sustained convictions for manslaughter where the death was caused by the reckless driving of an automobile, wherein we held an intent to kill, or malice, was not required to be proved. *People* v. *Falkovitch,* 280 Ill. 321, 117 N. E. 398, Ann. Cas. 1918B 1077; *People* v. *Camberis,* 297 Ill. 455, 130 N. E. 712; *People* v. *Schwartz,* 298 Ill. 218, 131 N. E. 806. Under the law as laid down in those cases we have no doubt where the proof is sufficient to

establish beyond reasonable doubt that under the circumstances of the injury the conduct of the driver of an automobile was so reckless, wanton, and wilful as to show an utter disregard for the safety of pedestrians, a conviction for assault to commit a bodily injury would be warranted. An injury caused by negligence, not amounting to a reckless, wilful, and wanton disregard of consequences to others, cannot be made the basis of a criminal action.''

In a later case, *People* v. *Benson,* 321 Ill. 605, 46 A. L. R. 1056, 152 N. E. 514, the court (we quote from headnote in 46 A. L. R.) held:

''One attempting to pass an overtaken automobile in a highway under conditions rendering his conduct so reckless and wanton as to show an utter disregard of the safety of the persons in the overtaken car may, if he strikes such car and causes injury to its occupants, be found guilty of an assault with a deadly weapon.''

In *Bleiweiss* v. *State,* 188 Ind. 184, 119 N. E. 375, 122 N. E. 577, it is said:

''There can be no doubt that an assault and battery may be committed by striking another with an automobile (*Luther* v. *State* [1912] 177 Ind. 619, 624, 98 N. E. 640), although, of course, there must be some evidence of a criminal intent. 'But the intent may be inferred from circumstances which legitimately permit it. Intent to injure may not be implied from a lack of ordinary care. It may be from intentional acts, where the injury was the direct result of them, done under circumstances showing a reckless disregard for the safety of others, and a willingness to inflict the injury, or the commission of an unlawful act which leads directly and naturally to the injury.' *Luther* v. *State, supra,* 177 Ind. 625, 98 N. E. 642.''

And upon a rehearing (188 Ind. 186, 122 N. E. 577), the court applied to the defendant's conduct the well-recognized common-law rule that—

"The law holds him to have intended the natural and probable consequences of his unlawful and reckless acts."

The rule announced in these cases was again approved in *Radley* v. *State,* 197 Ind. 200, 150 N. E. 97.

In *State* v. *Sudderth,* 184 N. C. 753, 27 A. L. R. 1180, 114 S. E. 828, it is held (headnote 27 A. L. R.):

"One causing injury by violation of the motor vehicle law may be prosecuted for murder or manslaughter if death ensues, and for assault in case of injury."

In *Banks* v. *Braman,* 188 Mass. 367, 74 N. E. 594, it is said:

"The law is regardful of human life and personal safety, and, if one is grossly and wantonly reckless in exposing others to danger, it holds him to have intended the natural consequences of his act, and treats him as guilty of a wilful and intentional wrong."

Where a party intentionally does an unlawful act such as driving his car at a reckless rate of speed, or at night-time without headlights, or on the wrong side of the road, as charged in the information, and while so violating a positive law recklessly and wantonly, and without regard for the life and limb of others, runs into and injures another person, the rule seems to be that his conduct imputes to him the intention to do what in fact he does do; and, in such circumstances, the courts unhesitatingly hold such party guilty of manslaughter, and we see no good reason why he may not be held for the lesser offense of aggravated assault. *State* v. *Sudderth, supra; Shorter* v. *State,* 147 Tenn. 355, 247 S. W. 985; *State* v. *Lewis,* 4 Penne. (Del.) 332, 55 Atl. 3; *State* v. *Schutte,* 87 N. J. L. 15, 93 Atl. 112; Id., 88 N. J. L. 396, 96 Atl. 659.

The words employed in the information to describe defendant's negligence show that it was wanton and reckless and in utter disregard of the safety of others, as also of himself, and are sufficient, if proved beyond a reasonable doubt to have been the proximate cause of the injury, to supply the wilful and unlawful intention to inflict bodily injury as required by the statute. We hold the information is sufficient.

The first four assignments of error are based upon rulings of the court on points questioning the sufficiency of the information; and holding, as we do, that the information states a public offense, it will not be necessary to pass on such assignments. The next four assignments raise the question of the sufficiency of the evidence to support or justify the verdict. A consideration of these requires that we look into the evidence.

B. F. McKinney testified that at about nine o'clock on the night of the 25th of May, 1925, he was driving an Essex car, with the prosecuting witness (his wife) and a Mrs. Lillard in the rear seat, in an easterly direction along the right side of the Buckeye road, and traveling about ten to twelve miles an hour, with headlights on; that as he approached the intersection of the Buckeye Road and Nineteenth Avenue of the city of Phoenix he indicated with his hand an intention to turn north on Nineteenth Avenue, and on the eve of turning north he saw defendant's car come into the light of his car, and it smashed into his while his car was still on the south or right side of the Buckeye Road and before he had turned on to Nineteenth Avenue; that defendant's car was on the south side of the road traveling west and had no lights; that when he first saw defendant's car it was some seventy-five feet from him, possibly a little farther; that when the cars came together his car was thrown into a driveway leading into Wainwright's yard, on the south

side of the Buckeye Road, and that his car was completely wrecked; that defendant's car (a Chalmers touring) turned over across on the north side of the road; that defendant was traveling forty or fifty miles an hour at the time.

Mr. Neil Bennett was sitting in his automobile just outside filling station at the moment of the collision, and he testified he saw the McKinney car coming from the west, going east along the Buckeye Road; that it was traveling ten or twelve miles and was on the south side of the road; that the headlights were on; that there was a noise "such as a car makes traveling fast, and then a crash" almost immediately; that the impact was such that it raised defendant's car completely off the ground; that the accident took place on the south side of the Buckeye Road, or the right side proceeding east; that he could not tell if defendant's lights were on before the accident, but afterwards they were not.

Mr. Paul Wainwright, who lived about one hundred feet south of the place where the cars collided, testified that he heard the crash, and, rising in his bed, saw a pile of dust go up and "a car in the air standing on its nose"; that it came down and hit the ground; that it was between him and the lights of the filling station. Going immediately to the scene, he and others tore the top off defendant's car, which was lying on its side, and assisted the occupants, consisting of a Mexican girl, a negro girl and defendant, in getting out; that while aiding them out of the car he smelt something like whisky; that defendant staggered around like he used to see drunken men when he was a boy.

Mr. Ray Sherman testified that he was in the filling station at the time of the accident; that he assisted the occupants out of defendant's car; that when the top was pulled off it "smelled like a brewery to him.

There was a great gust of whisky odor came out.'' He also said defendant was staggering and that in his opinion he was drunk. John Dean, who operated the filling station testified he heard the crash and smelled liquor around defendant's car. He also said the lights on the defendant's car were not on when he reached it just after the accident.

Mrs. May Cooper, who lived on the Buckeye Road, about three hundred feet east of Nineteenth Avenue, testified that defendant's car passed her place, going west, just before the crash ''at a fast rate of speed'' —so fast that she remarked it to her children, to whom she was reading.

Deputy Sheriff Frank A. Bell, who went to the scene of the accident on telephonic information and took defendant into custody, testified that defendant was groaning and that he (the deputy sheriff) said, ''You are not hurt; shut up; you are drunk''; and that defendant said, ''Well; I have been drinking, but I am hurt too.'' Deputy Sheriff Charles H. Wright also testified that in his opinion defendant was drunk. Deputy Sheriff T. E. Benton testified that he, at the place of the accident, asked this question: ''Which of you bunch have been drinking?'' And defendant said, ''I have been drinking, and I admit I am a little bit drunk.''

Susie Lucero, the Mexican girl who occupied a seat in defendant's car at the time of the accident, testified that about nine o'clock on the night of the 25th of May she and a colored girl by the name of Mrs. Pryor met the defendant at Third Avenue and Jackson Street, and that he invited them to go out riding; that she and the colored girl got in the same seat with defendant; that he then drove to Seventh Avenue and along Seventh Avenue to the Buckeye Road, and there turned west on the Buckeye Road; that defendant was driving about thirty-five or forty miles

an hour; that she asked him not to drive too fast, and that he said not to be afraid, that he was driving a car for thirteen years; that he did not slow up; that she discovered that he was drunk while he was driving on the Buckeye Road; that she saw the lights on the McKinney car and saw McKinney put his hand out, and then that she hid behind Mr. Brimhall's back and the accident happened right away; that defendant was traveling on the right side of the road at the time of the accident.

Lucy Lillard, one of the occupants of the McKinney car at the time of the accident, testified that the cars came together on the south side of the Buckeye Road and west of Nineteenth Avenue; that the defendant's car "was just like a bird swooping down out of the clouds on us"; that the headlights were not on; that the headlights on the McKinney car were on; and that it was traveling about ten or twelve miles.

The prosecuting witness, Lena McKinney, testified to being in her husband's Essex car at the time of the collision, occupying the rear seat with her sister, Mrs. Lillard; that it was traveling eight or ten miles, headlights on at the time; that she saw the defendant's car just before the accident; that it was right on them; that she did not see any lights on defendant's car; that she did not know what happened to her; that when she came to she was in the dirt; that she was injured on the cheek bone; that it was cut wide open; that she was bruised all over her body.

Dr. W. O. Sweek, who waited on Mrs. McKinney immediately after the accident, testified that he found the right side of her face "cut open and the outer angle of the eyebrow, what is known as the socket of the eye, crushed; the skull was broken, the brain here just to the right of the socket of the eye was exposed. I took out some bone, cut away some of the fat behind the eyeball, cleaned out the wound and

sewed it up, but the nerves going to the lower eyelid had been cut in two, and she has complete paralysis of the muscles of the lower eyelid."

The defendant testified that he was not drunk and had not been drinking; that he drove on the right side of the road going west; that he met several cars traveling on the right side of the road coming east as he was proceeding west on the right side of the road; that he was driving thirty or thirty-five miles an hour, had his lights on; that as he was approaching Nineteenth Avenue he met a car which appeared immediately in the intersection, on the east side of the intersection, and behind that car, immediately behind that car, came another car which turned immediately into him, and the accident happened, the collision took place; that he applied his brakes, turned his car to the right; that he was on the right-hand side of the Buckeye Road when the cars came together; that he remembered nothing after the accident other than picking himself up at the rear of the car; that he was taken to St. Joseph's Hospital and Dr. Felch dressed his wounds; that he received a cut across his chest or body, which the doctor sewed up, and that he was injured in other places.

Dr. Harry J. Felch attended the defendant at St. Joseph's Hospital shortly after the accident, and, testifying, he described the wounds that defendant received in the accident and the professional attention he gave them. He stated that he did not smell any liquor on defendant's breath and that he did not observe that he had been drinking.

This is a fair *résumé* of the testimony bearing upon the issue of defendant's guilt. It will be seen that there was evidence supporting every charge of negligence in the information. It shows defendant was intoxicated while driving his automobile; that he

drove it at night-time without headlights; that he drove it on the wrong side of the road and at an excessive rate of speed. His own admission is that he was going at the rate of thirty to thirty-five miles as he approached the intersection of Buckeye Road and Nineteenth Avenue, and it is apparent that, although he saw the McKinney automobile before the collision, his lack of control of his own car made it impossible to avert the accident. Although the defendant denied he was intoxicated, or that he was driving on the wrong side of the road, or that his lights were not on, the jury had a right to disregard his testimony and to believe that of the prosecution, and that is evidently what they did. The assignments based upon the insufficiency of the evidence to support the verdict cannot be sustained. The evidence overwhelmingly supports the verdict.

Assignments 9 to 15, inclusive, complain of instructions the court gave. In these instructions the jury were told that it was an offense under the statute: (1) To operate a motor vehicle on the public highways at a speed in excess of thirty-five miles an hour; (2) to operate it without lights after dark; and (3) to operate it while intoxicated—and that if defendant intentionally did these things, or any of them, he was engaged in a public offense. The specific objections to these instructions are that they had a tendency to mislead the jury and cause the jury to infer that if defendant did drive at a rate exceeding thirty-five miles, or without lights after dark, or while intoxicated, he was guilty of the offense charged in the information.

We do not believe that the instructions were susceptible of such interpretation, especially when taken in connection with the other instructions given and in the light of the issue the jury was trying, to wit, as to whether defendant was guilty of aggravated

assault. It was proper for the court to call the jury's attention to the regulatory provisions of the statute governing the operation of automobiles upon the public highways. *State* v. *Kline,* 168 Minn. 263, 209 N. W. 881; *State* v. *Peterson,* 153 Minn. 310, 190 N. W. 345; *State* v. *Hines,* 148 Minn. 393, 182 N. W. 450; *State* v. *Campbell,* 82 Conn. 671, 135 Am. St. Rep. 293, 18 Ann. Cas. 236, 74 Atl. 927. That the evidence of the prosecution clearly showed defendant was intentionally violating the motor vehicle law is too evident to need comment. Paragraph 5134, subdivision 1, Civil Code of 1913, reads:

"No person shall operate a motor vehicle on a public highway at a rate of speed greater than is reasonable and proper, having regard to the traffic and use of the highway, or so as to endanger life or limb of any person, or the safety of any property, or in any event on any public highway where the territory contiguous thereto is closely built up, at a greater rate than one mile in six minutes, or elsewhere in any incorporated city or town, at a greater rate than one mile in four minutes, or elsewhere outside of any incorporated city or town, at a greater rate than one mile in two minutes; subject, however, to the other provisions in this chapter."

Subdivision 2 reads:

" . . . Upon approaching a crossing of intersecting highways, at a speed not greater than is reasonable and proper, having regard to the traffic then on such highway and the safety of the public."

Subdivision 5 reads:

"Anyone operating a motor vehicle, while in an intoxicated condition, shall be guilty of a misdemeanor." . . .

Subdivision 2 of paragraph 5135, as amended by section 2, chapter 122, Laws of 1921, provides that every motor vehicle shall be provided, "during the period from one hour after sunset to one hour before

sunrise,'' with ''two lamps showing white lights visible within a reasonable distance in the direction towards which such vehicle is proceeding.''

The standard of care required of an operator of an automobile, as provided by the legislature, was stated by the court that the jury might determine whether defendant had violated such standard, and, if so, whether the accident was the result of such violation.

By instructions 16, 17, 18 and 19 (all assigned as erroneous), the jury were told by the court, in effect, that if they believed beyond a reasonable doubt defendant at the time of the collision was operating his automobile in a criminal and negligent manner, with reckless disregard to his own safety, and wilful indifference to the consequences likely to follow, and in such manner as to endanger the life or limb of persons who might be on the highway, and that such negligence was the proximate cause of the injury to Lena McKinney, and that the injury, if any, was a serious bodily injury, they should find defendant guilty of aggravated assault whether or not they believed the defendant specifically intended to inflict any injury on said Lena McKinney.

Complaint is made of these instructions for omitting to advise the jury that before defendant could be convicted of aggravated assault it was necessary to find that he intended to effect the collision with the McKinney car. In other words, the same objection is made to these instructions as was made to the information by demurrer. Under the authority of the cases cited by us on the sufficiency of the information, we hold the instructions complained of are not erroneous.

In support of his contention that the facts will not support a conviction of the offense of aggravated assault, defendant cites *State* v. *Richardson*, 179 Iowa 770, L. R. A. 1917D 944, 162 N. W. 28, and it must

be admitted that the reasoning in that case is largely in harmony with his contention. The facts were that the defendant was driving a car with defective brakes, in a dust storm, violating the statute requiring headlights after darkness, and possibly at a speed greater than prescribed by law, and while thus driving ran over a person who was sitting by another car repairing a tire. He did not see the person he ran over and did not know of his presence. In such circumstances it was held that the presumption that defendant intended the natural and necessary consequences of his act had no application, and that a conviction of an assault with intent to inflict upon another great bodily injury could not be sustained. Whatever may be said of this conclusion, and we are inclined to think the current of decision is against it, it is not decisive of the present case. In that case it does not appear that defendant was traveling where he had no right to travel, or on the wrong side of the road, or that he was intoxicated, or that he saw the injured party, or knew that he was in his pathway, or that noncontrol of his car had anything to do with the accident. Here we are dealing with a situation just the reverse.

The evidence is that there was considerable traffic at the intersection of Buckeye Road and Nineteenth Avenue. Defendant testified he met three or four cars, in going from Seventh Avenue to Nineteenth Avenue, traveling at a rate fixed by him at thirty to thirty-five miles an hour. There were two cars at the intersection trying to negotiate it as he approached, one just in front of the McKinney car (so he says) with signal lights, and on the corner was a service station also lighted. Defendant actually saw that the intersection was occupied, and if he had been operating his car with due regard for such traffic could

have brought it under control and avoided the collision.

Defendant also cites *Coffey* v. *State*, 82 Tex. Cr. 481, 200 S. W. 384, as supporting his contention. The facts of that case are not stated further than that the defendant's automobile was being negligently operated by him when he collided with the car occupied by the party injured. Mere negligence, of course, would not be sufficient upon which to base a conviction of aggravated assault. In the Coffey case another question entered into the court's consideration, and that was that after the accident, but before the prosecution, the legislature had passed an act making it a crime on the part of one operating an automobile who through gross negligence occasioned a collision with another motor vehicle. It is evident from the opinion of the court that until the passage of such act it was thought an aggravated assault was committed when serious bodily injury was inflicted by reason of the negligent operation of a motor vehicle. *Perkins* v. *State*, 62 Tex. Cr. 508, 138 S. W. 133; *Thompson* v. *State* (Tex. Cr. App.), 89 S. W. 1081.

We have no doubt the unfortunate accident in which Lena McKinney was so seriously injured would never have happened if defendant had been in his sober senses. No doubt it was the buoyant effect of what the defendant had been drinking that caused him so cavalierly to disregard the admonition of the Lucero woman not to drive so fast. As was said by the court in *Parroccini* v. *State*, 90 Tex. Cr. 320, 234 S. W. 671:

"This court is sufficiently informed on the construction and operation of automobiles to know, that a mixture of gasoline through the carbureter, and alcohol in the operator, is a dangerous combination, likely to eventuate in disaster."

If persons will persist in doing the things that dethrone reason and destroy discretion, and, as a result, run amuck, the courts will not be astute to discover avenues through which they may escape their just deserts. Voluntary drunkenness is never a defense to crime.

After considerable investigation and research, we have been forced to the conclusion that defendant was awarded a fair trial and that no prejudicial error was committed.

Accordingly, the judgment of conviction is affirmed.

McALISTER, J., concurs.

LOCKWOOD, J., Dissenting.—I regret to state I cannot agree with the conclusion of the majority of the court in this case. The defendant was convicted of an aggravated assault. The information charged substantially that the assault was committed by and through the grossly negligent driving of an automobile, and while defendant was violating some four different traffic laws. The court instructed the jury, in substance, among other things, that if they believed the defendant was violating the traffic laws and that the natural and probable result of such violations was the injury of the prosecuting witness, then they should find the defendant guilty. There were several other instructions along this line, and their sum and substance was that wilful and gross negligence on the part of defendant would take the place of the intent which is required ordinarily to combine with the act to complete the crime of assault.

It seems to me the reasoning necessary to support instructions of this tenor, if carried to its logical conclusion, would establish a very dangerous precedent. It is universally held in the English-speaking jurisdictions that no act alone is a crime unless accompanying it there is either an intent to do the

specific act, or else criminal negligence which causes it. I think it is almost as well established, and with equal reason, that criminal neglect can supply the place of the intent only when the legislative power has expressly so provided. The legislature can, and frequently does, for reasons of public policy, make a specific act criminal when it is negligently but not intentionally done. In view of the increasing use of powerful machinery such as automobiles by persons who are but little qualified either temperamentally, mentally, or physically to control them properly, it would no doubt be wise for the legislature to provide, in the interests of public safety, that any person who operated such machinery was not only civilly but criminally responsible for his negligence. A statute to this effect would be specific and involve nothing beyond the particular case under consideration.

It is to my mind, however, both a serious and a dangerous stretch of judicial authority for the courts to hold that negligence can in all criminal cases be substituted for specific intent. This conclusion. which must necessarily have been reached by the trial judge before he gave the instructions referred to, and which we also must reach to sustain them, would be judicial legislation on the broadest scale. If we substitute criminal negligence for intent in assault as a matter of judicial interpretation, it follows that it can equally be substituted in arson, mayhem, and many other crimes. If such is the public will, it is manifest the expression thereof should come from the legislative and not the judicial branch of the government.

Nor do I think most of the authorities cited in the majority opinion sustain the conclusion reached. Many of them are cases in which the defendant was convicted of manslaughter, and in each one it will be

found the statute governing that crime substantially provides that gross negligence, which causes the death of a human being, is *ipso facto,* manslaughter. It was, of course, within the power of the legislature so to provide, and the courts in those cases very properly held that no intent to kill was necessary. In the large majority of the remaining cases it will be found upon a careful analysis that the real holding was not that negligence may be *substituted* for intent, but that negligent conduct may be given in evidence as tending to *prove* or show the real intent with which an act was done. This, of course, is eminently correct, both on reason and authority. It is impossible for one human being to look into the mind of another and determine what his real knowledge or intent was at any particular time. Recognizing that fact, the law wisely provides that the intent with which a given act is done is manifested by the circumstances surrounding it and the sound mind and discretion of the accused, and that a man is presumed to intend the natural or inevitable result of his voluntary acts. But this is very different from a holding that negligence *takes the place of intent.*

There are, it is true, cases from two jurisdictions cited in the majority opinion, wherein the court did specifically hold that negligence would justify a conviction of assault. In both these jurisdictions, however, the original opinion laying down this doctrine first refers to the rule in regard to manslaughter, and then says, without any discussion or qualification, that under the rule governing manslaughter the same state of facts will constitute an assault if the injured party does not die. It seems to me that such statement on its face shows the fallacy of the conclusion; the rule in manslaughter being based on the provisions of a specific statute which does not cover the crime of assault.

That the defendant in this case, if the evidence offered by the state is true, deserves the most severe punishment, cannot be doubted. That the legislature, in view of the large and increasing number of automobile accidents, would be justified in providing that gross negligence in the handling of an automobile is a crime is equally true. But I cannot give my consent to a decision which, carried to its logical conclusion, is judicial legislation to the effect that gross negligence, in all cases where it might produce an act which causes harm, will act as a substitute for criminal intent, and I do not believe we should substitute it for intent in a specific crime when the legislature has failed to do so.

The case should be remanded to the superior court of Maricopa county for a new trial in accordance with the view expressed herein.