**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 40091**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2014 Opinion No. 64S** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: November 3, 2014** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| RICHARD ALLEN LARSON, | ) | |
| | ) | **SUBSTITUTE OPINION** |
| Defendant-Appellant. | ) | **THE COURT'S PRIOR OPINION** |
| | ) | **DATED AUGUST 15, 2014** |
| | ) | **IS HEREBY WITHDRAWN** |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Bonner County. Hon. Steven C. Verby, District Judge.

Judgment of conviction and sentence for two counts of aggravated assault, <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender; Sally J. Cooley, Deputy Appellate Public Defender, Boise, for appellant. Sally J. Cooley argued.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent. Jessica M. Lorello argued.

---

LANSING, Judge

Richard Allen Larson was charged with two counts of aggravated assault for threatening his ex-girlfriend with a firearm and threatening or attempting to shoot her new boyfriend. The case proceeded to trial and the jury found Larson guilty on both counts. On appeal, Larson argues that the district court erred by overruling his objection that a testifying officer was not qualified to give opinion testimony concerning the direction a bullet had traveled. He also contends that the court erred by allowing the prosecutor to make inaccurate statements during closing argument concerning the intent requisite for commission of assault.

1

# I.

## BACKGROUND

Lora Adams moved to Idaho and briefly dated Larson, her neighbor. After the relationship soured and Adams attempted to avoid contact, Larson was upset and made repeated efforts to convince Adams to continue dating him. Adams later began dating another man, John Bilsky. It is undisputed that Larson and Adams had an altercation, that Bilsky arrived shortly thereafter, and that Bilsky and Larson both discharged their firearms. The parties sharply dispute the details of the occurrence, but Larson was charged with two counts of aggravated assault, Idaho Code §§ 18-901, 18-905.

At Larson's trial, Adams and Bilsky testified as follows. They said that Larson was chronically abusive toward Adams, having repeatedly verbally and physically threatened her, and that Larson's violent behavior escalated on the day in question. In order for Adams to reach her home, she had to travel over a private road, a portion of which passed through Larson's property. Larson had placed two cables across the road at points on his property, using them as makeshift gates. Because of Larson's threatening behavior, Adams began notifying Bilsky when she was heading home and would be passing over Larson's land.

On the afternoon in question, Adams called Bilsky to tell him she was nearly home. When Adams came upon the first cable gate, she saw Larson in the vicinity and she relayed that information to Bilsky. Adams got out of her SUV to move the cable so that she could pass. Larson approached her angrily and drunkenly, shouted obscenities, and physically prevented her from getting back into her SUV. Adams tried to get away, but Larson slammed her hand in the vehicle door. Adams responded by kicking Larson. Larson then punched Adams and threw her to the ground, straddled her, and placed his gun on her face, saying, "I'm going to kill you and I want you to be more afraid than you've ever been in your life." Keeping one hand on his gun, Larson choked Adams with his other hand until Bilsky arrived.

When Adams did not arrive at home quickly, Bilsky became worried. He grabbed his revolver and walked from Adams' home toward the first gate. As he approached and walked around to the passenger side of Adams' vehicle, he saw Larson. Larson pointed his gun at Bilsky and took a position at the rear of Adams' SUV. From that position, Larson told Bilsky to leave and threatened to kill him. Bilsky took a position at the front driver's side of the SUV and moved back and away from the vehicle, keeping the vehicle between himself and Larson.

2

Thereafter, Larson, standing at the rear driver's side of the vehicle, fired several shots at Bilsky, but did not hit him. Bilsky returned fire. After Bilsky's second shot, Larson lowered his weapon. Bilsky and Adams fled in the SUV, afraid that Larson would reload and continue firing. In support of Adams' testimony, the State submitted pictures of her injuries. Those photographs depict redness circling the front of Adams' neck, over her trachea; red marks on both sides of Adams' face with two parallel scratches on the left side of her face; redness on Adams' torso; and a cut on Adams' hand.

Larson's testimony sharply contradicted the testimony of Adams and Bilsky. Larson said that he went to speak to Adams because she had repeatedly removed the surveyor's tape placed on the cable gates to increase visibility and refused to close the cable gates after passing through them, leaving the cables in the snow bank. When Adams arrived at the gate, he respectfully asked her to close the gate after passing through. Adams responded by apologizing for her interference with the gate. As Adams went back to her SUV, Larson tripped and fell into the vehicle's door, trapping Adams' hand between the door and the body of the vehicle and injuring her. Larson immediately apologized, but Adams attacked Larson, trying to knee him in the groin. Larson defended himself by pushing her into the snow. While Larson and Adams fought, Bilsky arrived at the area. Larson did not see him arrive, but heard him ask Adams if she was alright. Before Larson could turn around and face Bilsky, Bilsky shot Larson. Larson drew and repeatedly discharged his firearm until he was out of bullets. He testified that he "emptied [his] weapon just instinctually" because he had been shot and that he did not point his weapon at either Bilsky or Adams. After Bilsky and Adams fled, neighbors who had heard the shots called 911 for help and provided first aid. Larson was taken to the hospital for treatment of his gunshot wound.

Investigating police officers collected both Larson's Ruger .44 Magnum Red Hawk and Bilsky's Taurus .357. When seized, Bilsky's weapon contained two spent shell casings and five unspent bullets. Larson's weapon had been emptied by a neighbor who removed the empty shell casings at the scene while providing first aid to Larson. Officers found six spent .44 Magnum shell casings consistent with Larson's six-chamber firearm.

Larson was charged with two counts of aggravated assault, one count alleging that he threatened Adams with a firearm and one count alleging that he threatened Bilsky or attempted to injure him with a firearm, all in violation of I.C. §§ 18-901, 18-905. At a jury trial, Larson

3

was found guilty on both counts. Larson appeals from the judgment of conviction, asserting error at his trial in the admission of testimony and in allowing improper closing argument by the prosecutor.

## II.

## ANALYSIS

### A. The Court Did Not Err by Permitting the Officer to Testify as an Expert

During trial, the court permitted jurors to submit questions. After each witness testified, the court reviewed the questions with counsel and with the witness. After an officer testified regarding his investigation, including his observation of damage to Adams' SUV, a juror submitted a question asking whether the officer knew which direction a bullet traveled when it passed through the driver's side mirror of the SUV. Outside of the presence of the jury, the officer indicated that he did not know which direction the bullet traveled, and the court did not ask the question of that witness.

Later, the State called another investigating officer. In response to a question by the prosecutor, he testified that the bullet passed through the mirror from in front of the vehicle toward the rear of the vehicle. Larson objected as to foundation, and the court sustained the objection. In response, the State attempted to lay foundation. The officer testified that he had "very general" training regarding ballistics, bullet travel, and investigations relating to bullets. That training and experience consisted of carrying a firearm virtually every day for twenty years, testing or practicing using his firearm to remain qualified for his duties, "some schooling in shootings," participation in fifty to one hundred investigations that required determination as to which direction a bullet entered and exited an object, and helping his "underlings at the sheriff's department" work their cases. He also related his history of observing items that had been shot during his career and that he had stated, "[g]enerally, when a bullet enters an object, the entrance hole is the size or diameter of the bullet" and the exit hole is "a bigger hole." He explained that a bullet usually "mushrooms" when traveling through a medium such that its diameter when exiting a medium is wider than its diameter when entering a medium. He explained that the hole in the front of the driver's side mirror, the painted fiberglass portion, had a smaller hole than the back portion of the mirror, the mirrored side. Over several objections, the court permitted the officer to testify that he had concluded that the bullet traveled from the front of the vehicle toward the rear of the vehicle.

4

Idaho Rule of Evidence 702 governs the admission of expert testimony and states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"The five sources of expert qualifications identified in the rule are disjunctive. Therefore, academic training is not always a prerequisite to be qualified as an expert; practical experience or specialized knowledge may be sufficient." *State v. Glass*, 146 Idaho 77, 82, 190 P.3d 896, 901 (Ct. App. 2008) (internal citations omitted); *see also Idaho Dep't of Health & Welfare v. Doe*, 149 Idaho 474, 477, 235 P.3d 1195, 1198 (2010) ("Formal training is not necessary, but practical experience or special knowledge must be shown to bring a witness within the category of an expert." (quoting *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 837, 153 P.3d 1180, 1183 (2007))). For example, we have held that a detective's training regarding Internet crimes against minors and experience investigating those crimes rendered him competent to testify "in regard to the uniqueness of screen names and the applications of Yahoo" even though the officer lacked "specific computer program training." *Glass*, 146 Idaho at 83, 190 P.3d at 902. The admissibility of expert testimony is a matter within the discretion of the trial court, and this Court will not disturb the lower court's ruling absent an abuse of that discretion. *Fragnella v. Petrovich*, 153 Idaho 266, 274, 281 P.3d 103, 111 (2012); *J-U-B Eng'rs, Inc. v. Security Ins. Co. of Hartford*, 146 Idaho 311, 315, 193 P.3d 858, 862 (2008).

The defense argues that the officer's opinion testimony on the bullet's direction of travel was "technical ballistics information" and that the officer never testified that he had been the person responsible for determining the path a bullet traveled in any particular case. We conclude, however, that the officer had sufficient expertise and that the defendant inaccurately characterizes the testimony as "technical ballistics information." Within any domain of knowledge there are more technical and less technical areas; there is expertise that can only be acquired by significant scientific or technical study, and there are matters that are common knowledge to anyone experienced in a particular field. Our Supreme Court recognized this when it noted that an expert "may be qualified to render opinions about some things within a particular professional field but not others." *Glass*, 146 Idaho at 83, 190 P.3d at 902. Accordingly, we need not determine whether the district court erred by permitting the officer's testimony here because he may lack the knowledge required to give expert ballistics testimony in some

hypothetical case; we need only decide if the district court erred by concluding that the officer had sufficient expertise to render the specific opinion he gave in this case.

In our view, the mushrooming of bullets and the relative size of entrance and exit holes are not particularly technical or arcane subjects. Both the deformation of bullets once fired into a dense medium and the size of the entrance and exit holes on an object would be readily observable to any person watching the process. One need not engage in extensive technical study, take specialized measurements, or employ specialized tools of scientific analysis to make these simple observations. We suspect that any person who routinely uses a firearm to shoot objects or who sees the aftermath of such shootings as a regular part of their employment or recreation could make such an observation. Here, the officer testified that his skills with a firearm are routinely assessed, demonstrating his regular use of firearms; that he has frequently seen the aftermath of such shootings in his work; and that he has participated in many investigations that included determining a bullet's path. Accordingly, we conclude that the court did not abuse its discretion by allowing the officer to state his opinion.

**B.    The Court Erred by Overruling an Objection to the Prosecutor's Explanation of a Jury Instruction, but the Error Is Harmless**

Larson also argues that the district court erred by overruling his objection to the prosecutor's statements during closing argument regarding a jury instruction that was based on I.C. § 18-114. Both the statute and the instruction given by the district court state, "In every crime or public offense there must exist a union, or joint operation, of act and intent." The prosecutor told the jury that "the word 'intent' in this context does not mean the intent to commit a crime." Larson objected to that characterization, but his objection was overruled. The prosecutor then continued:

> PROSECUTOR: [Y]ou don't have to have the intent to commit the crime itself; you [need to] have the intent to commit the interdicted act. That is, you don't have to have the intent to commit the crime of aggravated assault; you have to have the intent to point and point the weapon, use--
> DEFENSE COUNSEL: Objection, again.
> PROSECUTOR: --so in an assaultive manner.

Larson's objection was again overruled and the prosecutor continued by analogizing the instant case to a driving under the influence case where the State would be required to prove the intent to drive but not the intent to drive while under the influence of alcohol.

6

By terms of the statute under which Larson was charged, I.C. § 18-901, a person can commit the crime of assault in one of two ways:

> (a) An unlawful attempt, coupled with apparent ability, to commit a violent injury on the person of another; or
>
> (b) An intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.

The instructions given to the jury correctly specified the elements under each of these subsections. Larson argues that the prosecutor's purported explanation of the mental element misstated the law and impermissibly reduced the State's burden of proof.

The State argues that the prosecutor properly described the applicable intent requirement, relying upon *State v. Bonaparte*, 114 Idaho 577, 759 P.2d 83 (Ct. App. 1988). With respect to the "attempt" form of assault defined in I.C. § 18-901(a), that opinion states that "the intent element of assault with a deadly weapon may be satisfied by proof [that the defendant] intended to cause harm when firing [a gun] or *that he fired it with reckless disregard for the risk of injury he thereby created.*" *Bonaparte*, 114 Idaho at 580-81, 759 P.2d at 86-87 (emphasis added). The *Bonaparte* decision largely rests upon the holding in *State v. Patterson*, 60 Idaho 67, 88 P.2d 493 (1939). In *Patterson*, the defendant was charged with the "attempt" form of assault. It was alleged that he, knowing that a home was occupied and in range of his shotgun, and unable to see the home or the people in it because of darkness, nonetheless "carelessly, negligently and wantonly and recklessly" discharged a firearm at a home, striking a person with a shotgun pellet.[1] After a jury found the defendant guilty, he unsuccessfully moved for a new trial on the basis that the State had not proven that he intended to commit a violent injury. The Idaho Supreme Court rejected the defendant's argument that actual intent to injure must be proved. The Court said:

> Where . . . the injury is the result of reckless, wanton, and willful conduct, showing an utter disregard for the safety of others, the law imputes to the wrongdoer a willful and malicious intention even though he may not in fact have entertained such intention.

---

[1] The defendant sought to dismiss the information arguing that it was duplicative because it charged both assault and battery. The court overruled the motion, holding that other language in the pleading amounted to an election to proceed solely as to an assault charge.

*Id.* at 73, 88 P.2d at 495 (quoting *Brimhall v. State*, 255 P. 165 (Ariz. 1927), *overruled by State v. Balderrama*, 397 P.2d 632, 636 (Ariz. 1964)).

We have previously noted that *Patterson* and *Bonaparte* are inconsistent with more recent Idaho appellate authority. In *State v. Crowe*, 135 Idaho 43, 46, 13 P.3d 1256, 1259 (Ct. App. 2000) we said, "[T]his Court doubts the continuing viability of the *Patterson* rule in light of more recent Idaho Supreme Court decisions indicating that guilt of 'attempt' crimes requires intent to commit the 'attempted' offense." We went on to hold that, with the defendant having been charged with the "threat" type of assault under I.C. § 18-901(b), it was error for the trial court to give a jury instruction that "the law will impute or attribute to the defendant a willful intention even though he may not in fact have entertained such intention" because the instruction diminished the State's burden to prove the mental element of the offense and, in effect, modified the mental element from intent to negligence. *Crowe*, 135 Idaho at 47, 13 P.3d at 1260. Here, because Larson was charged under both the "threat" and "attempt" types of assault, we must address the continued viability of *Bonaparte* and *Patterson*.

For the last two decades, both this Court and the Idaho Supreme Court have held that the specific intent to commit the "attempted" act is an element of an attempt charge. In *State v. Pratt*, 125 Idaho 546, 558, 873 P.2d 800, 812 (1993), the Idaho Supreme Court held that when a person is charged with the "crime of attempt to commit a crime . . . the state bears the burden of proving that the defendant *intended* to commit the crime." The Court credited the defendant's argument that this conclusion is required by I.C. § 18-305, which defines attempts. Although the Supreme Court did not specifically overrule *Patterson*, it did announce a general rule, and we see no principled basis upon which we could conclude that an attempt for the purpose of the assault statute is treated differently from an attempt to commit some other crime. *Patterson* and *Bonaparte* are also inconsistent with more recent decisions of this Court. *State v. Grove*, 151 Idaho 483, 494, 259 P.3d 629, 640 (Ct. App. 2011) ("attempts are, by definition, specific intent crimes"); *State v. Hansen*, 148 Idaho 442, 445, 224 P.3d 509, 512 (Ct. App. 2009) (holding that it was error to give the general intent jury instruction for an aggravated assault charge); *State v. Swader*, 137 Idaho 733, 737, 52 P.3d 878, 882 (Ct. App. 2002) ("Attempt consists of the intent to do an act which would in law amount to a crime and an act in furtherance of that intent."); *State v. Carlson*, 134 Idaho 389, 401, 3 P.3d 67, 79 (Ct. App. 2000) ("All attempts are specific intent crimes."); *accord* 2 W. LaFave Substantive Criminal Law § 16.3(a) (2nd ed. 2003) ("An

attempt to commit any crime requires specific intent to commit that crime; and so assault of the attempted-battery sort requires an intent to commit a battery."); *see also State v. Pole*, 139 Idaho 370, 375, 79 P.3d 729, 734 (Ct. App. 2003) (declining to apply *Patterson* in a battery case and holding that the *mens rea* applicable to a battery charge requires that a defendant "intend a forceful or violent contact with another person").[2] Accordingly, we conclude that *Patterson* and *Bonaparte* have been implicitly overruled and that by the plain language of I.C. § 18-901(a), assault by attempt to commit a violent injury requires actual intent to injure.

As to the second means of committing assault, "Idaho Code § 18-901(b) requires only that the state prove an intent to make a threat." *State v. Dudley*, 137 Idaho 888, 891, 55 P.3d 881, 884 (Ct. App. 2002); *see also Pole*, 139 Idaho at 373, 79 P.3d at 732 (holding that "aggravated assault under I.C. § 18-901(b) requires an intent to make a threat, by word or act, to do violence to another, but no actual intention to cause apprehension"). In *Hansen*, 148 Idaho at 445, 224 P.3d at 512, this Court found error in an instruction that diminished the intent element where the defendant was charged with aggravated assault by threatening the victim with a deadly weapon. The trial court there instructed the jury that "[i]ntent under Idaho law is not an intent to commit a crime but is merely the intent to knowingly perform the *act committed*." *Id*. (emphasis added). The defendant argued that this instruction was erroneous because it required only the intent to fire a weapon, i.e. "the act committed," but not the intent to threaten the victim. *Id*. We agreed and concluded that giving the instruction amounted to error. *Id*. at 445-46.

Here, the prosecutor's statement was not consistent with the foregoing authorities. The "intent to point a weapon . . . in an assaultive manner" is not the equivalent of the intent to cause a violent injury, the *mens rea* element required by I.C. § 18-901(a); one can point a firearm at a person in an intimidating way but not intend to shoot. Likewise, an "intent to commit the interdicted act" is not equivalent to the intent to threaten, the *mens rea* element required by I.C.

---

[2] We have also held that when instructing the jury regarding I.C. § 18-901(a), it is sufficient to use the plain words of the statute. *See State v. Broadhead*, 139 Idaho 663, 666, 84 P.3d 599, 602 (Ct. App. 2004). The common usage of the term "attempt" as generally understood by the public is sufficient to convey to the jury that they must "find an element of intentional action" in order to return a guilty verdict. *Id*.

§ 18-901(b).[3] The meaning of the "intent to commit the interdicted act" is ambiguous and could have been understood by the jury to require only an intent to point the weapon. It is equivalent to the intent to "perform the act committed," language used in *Hansen*, 148 Idaho at 445-46, 224 P.3d at 512-13, which we held to be erroneous when a person is charged with assault under I.C. § 18-901(b). Because the prosecutor's description of the required mental elements was inaccurate, the district court erred by overruling Larson's objection.

Having found error, we must determine whether that error was harmless. Here, the harm produced by the error is akin to harm produced by instructional error--the possibility that the jury reached its verdict based upon an erroneous legal standard. For instructional error we apply a two-part test:

> [A]n appellate court must first determine whether an improper jury instruction affected the entire deliberative process. If it did, then a reversal is necessary as the jury's deliberations were fundamentally flawed, and any attempted harmless error inquiry would essentially result in the appellate court itself acting in the role of jury. However, where the jury instructions were only partially erroneous, such as where the jury instructions improperly omitted one element of a charged offense, the appellate court may apply the harmless error test, and where the evidence supporting a finding on the omitted element is overwhelming and uncontroverted, so that no rational jury could have found that the state failed to prove that element, the constitutional violation may be deemed harmless.

*State v. Perry*, 150 Idaho 209, 224, 245 P.3d 961, 976 (2010); *see also Neder v. United States*, 527 U.S. 1 (1999) (applying harmless error analysis to instructional error).

Few errors "affect the entire deliberative process." For example, a defective reasonable doubt instruction is a structural defect that vitiates the jury's entire deliberative process. *Perry*, 150 Idaho at 223, 245 P.3d at 975; *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). The erroneous description of the intent element does not affect the entire deliberative process and thus we may review for harmless error. *See Hansen*, 148 Idaho at 447, 224 P.3d at 514 (wherein we applied harmless error analysis to an analogous instruction error). We must determine whether the record contains evidence that could rationally lead to a finding for the defendant, with respect to the omitted element. *Neder*, 527 U.S. at 19.

---

[3] Whether the intent to "point the weapon . . . in an assaultive manner" is the equivalent of an intent to threaten may be a closer question. However, we note that this description is hopelessly circular because it describes an element of the crime of assault by using the term "assaultive."

10

In *Hansen*, we concluded that the instructional error was harmless because "the record contains no evidence that could rationally lead to a finding for [the defendant] with respect to the intentional threat element." *Hansen*, 148 Idaho at 447, 224 P.3d at 514. In that case, the "intent to threaten element was not seriously contested." *Id.* at 446, 224 P.3d at 513. The defendant did not claim that he lacked the requisite intent; instead, Hansen appears to have argued that the State could not prove whether it was he or his associate who discharged the firearm. We concluded that there was no basis in the evidence from which the jury could have found that it was Hansen who fired the weapon but that he did not have the intent to threaten the victims.

Likewise in *State v. Thompson*, 143 Idaho 155, 139 P.3d 757 (Ct. App. 2006), we concluded that the judge's failure to give the required *mens rea* instruction was harmless error. In that case, the defendant argued that the police lied when they said that he possessed drugs in his pockets, asserting, *inter alia*, that his pants had no pockets. *Id.* at 159, 139 P.3d at 761. The instructions given to the jury omitted an element of the offense requiring the State to prove that the defendant knew the substance in his possession was a controlled substance. In that case, we concluded that the instructional error was harmless given that the jury's finding of guilt amounted to a rejection of the proffered defense. *Id.* We observed that there was no evidence whereby the jury could have rejected Thompson's "pocketless sweatpants" defense, as it did, and also find that he had a controlled substance in his pockets but did not realize that it was a controlled substance. *Id.*

Both cases are consistent with the rationale of the United States Supreme Court's harmless error analysis in instructional error cases. "Reversal without any consideration of the effect of the error upon the verdict" would result in needless retrials "not focused at all on the [issues raised on appeal], but on contested issues on which the jury was properly instructed." *Neder*, 527 U.S. at 15.

In this case, we find the error harmless. Here, the jury was properly instructed as to both prongs of an assault charge. It was also instructed, "You must follow the rules as I explain them to you . . . If anyone states a rule of law different from any I tell you, it is my instruction you must follow." Thus, the jury was told not to rely on an attorney's argument that was inconsistent with the court's instruction. Further, even if the jury applied the law as erroneously described by the prosecutor, it necessarily rejected Larson's defenses. Larson had two somewhat contradictory defenses, and the State offered two potentially inconsistent descriptions of the

intent required: "intent to commit the interdicted act"[4] and "intent to . . . point the weapon . . . in an assaultive manner." Under any combination of defense and erroneous statement of the *mens rea*, the error was harmless.

We address first the charge of assault on Bilsky. Larson's first defense was that Bilsky shot first and Larson acted in self-defense. The jury was instructed regarding self-defense and necessarily rejected that defense in finding Larson guilty of an aggravated assault on Bilsky. The erroneous *mens rea* description could not have affected the jury's determination of the self-defense claim.

Larson's second defense was that he reflexively fired his gun without aiming it at anyone. Even if we assume that the jury applied the "intent to commit the interdicted act" *mens rea*, as described by the prosecutor, in the manner most detrimental to Larson, the jury must have found that Larson intended to point or fire his gun, rejecting the mistake or reflex defense. Likewise, a jury determination that Larson "inten[ded] to . . . point the weapon . . . in an assaultive manner" also rejects the reflex or mistake defense.

We similarly conclude that with respect to the charge of assault on Adams, the jury necessarily rejected Larson's defense and that any erroneous description of the mental element did not affect the verdict. As to that count, the State's evidence was that Larson put his firearm on Adams' face and said, "I'm going to kill you and I want you to be more afraid than you've ever been in your life." If Larson intended to commit that "interdicted act" (putting the firearm on Adams' face), he certainly intended to threaten Adams. Larson did not contend that he performed this act but without intent to threaten; he testified that he did not do it at all. The jury rejected that contention. No rational jury could conclude that Larson pressed the weapon to Adams' face but did so without intent to threaten.

There is no version of the facts presented in the trial evidence that could rationally support a finding that Larson intentionally fired his gun without intent to threaten or injure

---

[4]     This Court has used the phrase "interdicted act" in modern opinions because that term was used as a term of art in older cases. *See, e.g.*, *State v. Parish*, 79 Idaho 75, 78, 310 P.2d 1082, 1083 (1957); *State v. Taylor*, 59 Idaho 724, 738, 87 P.2d 454, 460 (1939); *State v. Billings*, 137 Idaho 827, 830, 54 P.3d 470, 473 (Ct. App. 2002). However, the phrase is not commonly used by either lawyers or laypeople and could easily be misunderstood. Therefore, in our view, use of that term to explain an issue to a jury is unhelpful and should be avoided.

Bilsky, or intentionally pressed his gun against Adams' face without the intent to threaten her. Therefore, there is no reason to believe that the prosecutor's erroneous *mens rea* description affected the outcome of the trial. Accordingly, a retrial would serve only to permit Larson to relitigate defenses that the jury rejected. Therefore, we conclude that the error was harmless.

## III.

## CONCLUSION

The district court did not err by permitting the officer to testify to his opinion on the direction of travel of a bullet. Although we conclude that the district court erred by failing to sustain Larson's objection when the prosecutor misstated the law regarding the intent element for assault, this error was harmless on the facts of this case. Accordingly, the judgment of conviction is affirmed.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**